IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>JEREMY MICHAEL PARK,<br><br>                    Appellant. | No. 85555-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Jeremy Park was convicted of child molestation in the first degree of his minor daughter, E., with an aggravating circumstance that the crime was a part of an ongoing pattern of sexual abuse of the same victim. He seeks reversal of his conviction on three bases. First, he asserts insufficient evidence supported the determination that the molestation occurred in Whatcom County. Second, he claims the trial court erred by denying his motion to dismiss or to grant a continuance because the prosecution failed to pursue records containing potential impeachment evidence about a witness. Third, he argues prosecutorial misconduct deprived him of his constitutional right to a fair trial.

Park also challenges various aspects of his sentence, including community custody conditions requiring a mental health evaluation and treatment, and consent to home visits by the Department of Corrections (DOC) to monitor compliance with supervision. Further, he seeks remand to strike the victim penalty assessment (VPA) and community custody supervision fees from his sentence. And in Park's statement of

additional grounds for review (SAG), he argues additional discovery violations and claims that the court improperly admitted evidence without a proper limiting instruction.

We remand to the trial court to strike the community custody condition requiring a mental health evaluation, the VPA, and the community custody supervision fees. We otherwise affirm.

FACTS

Jeremy Park is the father of E., the victim of the crime of conviction. Park and E.'s mother, Rachel Sullivan, were in a relationship for approximately three to four years. E. was born in February 2005, and the three lived in an apartment in Bellingham before moving to a house, also in Bellingham. After Park and Sullivan ended their relationship, Sullivan moved out with E. around 2006-07 and was the primary residential parent.

E. would visit Park at the house in Bellingham. Park later moved into an apartment in Bellingham with his girlfriend, Breanna Carlson. For approximately three years, E. visited the apartment and would stay overnight. Park and Carlson eventually decided to move to Yakima.

E. decided she wanted to move to Yakima and live with her father. E. moved to Yakima in the middle of her third-grade year and stayed through fourth and fifth grade. E. eventually decided to move back to Bellingham to live with her mother for sixth grade, where she remained for seventh and eighth grade.

In 2018, when E. was in eighth grade, she made an appointment with her school counselor, Angie Penner. While talking with Penner, E. accused Park of sexually abusing her. Penner contacted child protective services immediately, and a detective

with the Bellingham Police Department (PD), Adam "Bo" McGinty, was assigned to the case. At the start of the investigation, E. underwent a forensic interview, during which she shared details about a vibrator owned by Carlson and drew a picture of it. Police then contacted Carlson to determine if she could corroborate the description, and she did.

After observing E.'s interview, McGinty suggested that they perform a "tipped phone call," where E. would try to get Park to say incriminating statements to her while officers were also present. E. and Sullivan agreed to participate. With McGinty and two other officers present, E. called Park and asked him a series of questions related to sex and visiting a "lady doctor." McGinty testified at trial that he initially took notes during the call and then he and another officer present compared notes. McGinty prepared a report of the call shortly after that incorporated the notes and then shredded his handwritten notes.

The State charged Park with one count of rape of a child in the first degree and one count of child molestation in the first degree, each with the aggravating circumstance that the offense was part of an ongoing pattern of sexual abuse over a prolonged period.

Before trial, Park interviewed McGinty and inquired about his prior police employment in Mississippi. According to McGinty, the only discipline he recalled was a vehicle accident, where he "backed into a fixed object so it was obviously [his] fault." He also shared that he and "about eight officers" had been sued based on claims

3

concerning a false arrest. Park asked if McGinty had "any Brady[1] material filed against [him]," and he responded he did not, although he shared that he was unsure if the Bellingham prosecutor's "Brady team" had examined his behavior or file. When asked if civilians or people he arrested had filed complaints against him, he said, "I know I got multiple complaints." He explained that it was "extremely common in the south" for officers to receive citizen complaints.

Park asked McGinty if he were willing to sign a release to permit the defense to view his files from Mississippi, because he could not access them without McGinty's permission. McGinty refused. The prosecutor, who was present, told McGinty he did not have to sign the release.

The State filed a pretrial motion to exclude references to previous internal investigations, external complaints, or lawsuits regarding "McGinty's past law enforcement experience except for materials that would fall under Brady." During argument on the motion, the State acknowledged that it had not "done anything since [the] interview" concerning inquiries into McGinty's Mississippi or Bellingham PD employment files. Park argued that he had attempted to get the files from McGinty's Mississippi employer and the Bellingham PD, but could not do so without a signed release.

Park then filed a motion pursuant to CrR 4.7 and CrR 8.3, requesting dismissal of the case, exclusion of McGinty's testimony, or a continuance until "the Mississippi personnel file [wa]s turned over for inspection." The court denied the motion, noting

---

[1] Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective" of the good or bad faith of the prosecution).

Park failed to raise any outstanding discovery issues until the day trial began, and determined Park failed to establish a Brady violation.

Following trial, a jury acquitted Park of the charge of rape of a child but found him guilty of child molestation in the first degree and the aggravating circumstance that the offense was part of an ongoing pattern of sexual abuse of the same child over a prolonged period. Park timely appeals.

## DISCUSSION

Park appeals his conviction on multiple bases. First, he contends that the State was required to prove the charged crime took place in Whatcom County but it failed to do so. Second, he argues the trial court abused its discretion when it dismissed his CrR 4.7 and CrR 8.3(b) motion to dismiss. Third, he contends that he was denied his right to a fair trial during closing argument due to prosecutorial misconduct. He also argues, in his SAG, that there were additional discovery violations given the destruction of the "tipped phone call" notes and the withholding of other "rough notes." He also claims the trial court erred by admitting evidence of acts that occurred outside of Whatcom County.

Finally, Park challenges two community custody conditions and seeks remand to strike the VPA and community custody supervision fees.

I. Sufficiency of the Evidence

Park contends that insufficient evidence supports his conviction because the State failed to prove that the charged "act occurred in the State of Washington, County of Whatcom," as stated in the "to convict" instruction. We disagree.

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017).

5

Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014), abrogated on other grounds, State v. Roberts, 5 Wn.3d. 222, 232, 572 P.3d 1191, 1198 (2025). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. at 201. Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015). However, "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

When a Washington court conducts a sufficiency of the evidence review, the "law of the case" doctrine applies. Johnson, 188 Wn.2d at 756, 762. Under this doctrine, "the State must prove otherwise unnecessary elements included without objection in the to-convict instruction." Id. at 754. Here, although the crime of child molestation in the first degree does not require proof of the county where the crime occurred, the "to convict" instructions stated that the elements that must be proved beyond a reasonable doubt included "[t]hat this act occurred in the State of Washington, County of Whatcom." Thus,

6

here, under the "law of the case" doctrine, the State had to prove Park molested E. in Whatcom County.

Park compares his case to State v. Hickman, 135 Wn.2d 97, 954 P.2d 900 (1998), in which the court reversed a conviction for insurance fraud because the State failed to prove the crime occurred in Snohomish County. In Hickman, the information charged the defendant with "presenting, or causing to be presented, in Snohomish County, a false or fraudulent insurance claim." Id. at 100. At the time of the alleged crime, the defendant was living in Hawaii and agreed with two acquaintances to fake the theft of a vehicle he left in Washington. Id. The only references to the county were from the Snohomish County Sheriff, "who testified that he received a call reporting the car stolen 'off Logan Road' without specification as to the Logan Road location, and by the sheriff's deputy who testified he located the stripped car hulk on a rural road in Snohomish County." Id. The court held this evidence was insufficient to prove the crime occurred in Snohomish County because the crime required someone to "knowingly present or cause to be presented a false or fraudulent claim," and none of the evidence supported such a finding. Id. at 105-06. When Hickman reported the theft, he called from Hawaii and contacted his insurance company, located in King County, Washington. Id. at 100. Furthermore, even assuming Logan Road was in Snohomish County, the State failed to demonstrate that the defendant knowingly presented or caused to be presented a fraudulent insurance claim in Snohomish County. Id. at 106.

Unlike in Hickman, in which no evidence placed the charged crimes in Snohomish County, here, there was testimony placing the crime of conviction in Whatcom County. At trial, E. testified that she was repeatedly molested by Park at

7

different locations in Bellingham before she moved to Yakima with Park and Carlson.

She specifically described two locations within Bellingham where she was molested: a

house on Cottonwood Avenue and the Canterbury apartments. E. also described

moving from Yakima back to Bellingham into a home on Woodbine Way with her

mother. At the time of trial, she referenced Whatcom while describing her college-level

coursework:

> [State]: You're taking college courses at Sehome?
>
> [E.]: No, I'm taking college courses at Whatcom High School through the
> Running Start Program . . . I'm enrolled technically in Sehome High
> School, but all my classes are at Whatcom Community."

Park points to In re Detention of T.C. to support his contention that the factfinder

cannot rely on personal knowledge. 11 Wn. App. 2d 51, 450 P.2d 1230 (2019). In that

case, the judge did "not find the respondent's testimony credible in almost any way." Id.

at 55. Particularly, the judge explained that the respondent, T.C. "says that there was a

courthouse built on First Avenue in 1999, which is not accurate. I'm a judge and have

been in practice here in Seattle for much longer than since 1999 and that courthouse

doesn't exist." Id. We held that while the judge improperly relied, in part, on his personal

knowledge that a courthouse referenced by T.C. did not exist, the court also provided "a

multitude of other factors within the evidentiary record" to support his determination that

T.C. was not credible. Id. at 59. The facts here are different, as there is no indication the

factfinder relied on personal knowledge. To the contrary, there was evidence in the

record from which a reasonable juror, using their common sense and experience, could

infer that the crime occurred in Bellingham and that Bellingham is in Whatcom County.

E.'s reference to "Whatcom" when describing her "Running Start" coursework further

supports the inference that Bellingham, where she moved to live with her mother, is in Whatcom County. Viewing the evidence in the light most favorable to the State, any reasonable juror could have concluded beyond a reasonable doubt that Park molested E. in Whatcom County.

II. Claims Relating to State's Discovery Obligations

Park contends the trial court erred when it denied his CrR 8.3(b) motion to dismiss or continue. Park's motion argued that the State failed to learn of potential impeachment evidence because it did not inquire into McGinty's prior police employment in Mississippi, and this amounted to a violation of its duties under Brady and CrR 4.7. The State counters it did not violate its CrR 4.7 obligations given the information "known or imputed to the State when Park was tried."[2] We hold that the court did not err in denying Park's CrR 8.3(b) motion.

To ensure fairness, the prosecution has a constitutional duty to turn over material evidence that is favorable to the defense, including impeachment evidence. Brady v. Maryland, 373 U.S. 83, 87 (1963). This duty includes the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995).

In Washington, "[CrR] 4.7 defines the discovery obligations for both the prosecution and defense." State v. Linden, 89 Wn. App. 184, 190, 947 P.2d 1284 (1997); see also City of Seattle v. Lange, 18 Wn. App. 2d 139, 148, 491 P.3d 156 (2021). The trial court has discretion under CrR 4.7 to grant a continuance, dismiss an

---

[2] The State noted in its briefing on appeal that "[a]fter Park was convicted, following an internal investigation by the Bellingham Police Department, Detective McGinty was fired and charged with theft." Based on that new evidence, Park filed a CrR 7.8 (b) motion seeking a new trial.

action, or enter another appropriate order as a sanction for failure to comply with a discovery order. CrR 4.7(h)(7)(i); State v. Barry, 184 Wn. App. 790, 796, 339 P.3d 200 (2014) (it is within the trial court's discretion to decide how to address an alleged discovery violation).

A trial court also has discretion pursuant to CrR 8.3(b) to dismiss charges if the "defendant shows by a preponderance of the evidence (1) 'arbitrary action or governmental misconduct' and (2) 'prejudice affecting the defendant's right to a fair trial.' " State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997)). In proving prejudice, "the defendant must show actual prejudice, not merely speculative prejudice affected [their] right to a fair trial." State v. Kone, 165 Wn. App. 420, 433, 266 P.3d 916 (2011).

We have explained the distinct purposes of CrR 4.7, CrR 8.3, and Brady, respectively, as follows:

> It is long-established that a primary purpose of Washington's criminal discovery rules, including CrRLJ 4.7, is to ensure a fair trial by safeguarding the defendant's ability to prepare a defense and to safeguard the prosecution from surprise.[3] CrRLJ 8.3 "exists 'to see that one charged with [a] crime is fairly treated' " throughout the entire prosecution. And the constitutional standards articulated in Brady establish the minimum due process protections a defendant enjoys around discovery. Because each has a different purpose, each has a distinct analysis.

Lange, 18 Wn. App. 2d at 147-48 (emphasis omitted) (quoting Michielli, 132 Wn.2d at 245).[4]

---

[3] See State v. White, 74 Wn.2d 386, 394, 444 P.2d 661 (1968) (analyzing RCW 10.37.030, the precursor to CrR 4.7) (citing State v. Townsend, 7 Wash. 462, 35 P. 367 (1893); State v. Thomas, 8 Wn.2d 573, 113 P.2d 73 (1941)).

[4] The criminal rules for courts of limited jurisdiction (CrRLJ) that were interpreted in Lange are substantively identical to the criminal rules for the superior court (CrR) that are at issue here.

We review decisions on CrR 4.7 and CrR 8.3(b) motions for an abuse of discretion. State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017); State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993); (CrR 4.7). A trial court abuses its discretion when the decision is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons. Blackwell, 120 Wn.2d at 830. "A decision is based on 'untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." Rohrich, 149 Wn.2d at 654 (quoting State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

A.  Discovery Obligations under CrR 4.7

First, Park argues the court erred by ruling that he had waived his claims about the State's failure to provide discovery because he did not raise the issue at the omnibus hearing. CrR 4.7(h)(2) recognizes a continuing obligation to disclose information within the scope of the discovery rules:

> If, after compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, the party shall promptly notify the other party or their counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.

Additionally, regarding sanctions for discovery violations, if at any time during the proceedings "it is brought to the attention of the court that a party failed to comply with an applicable discovery rule," the trial court may order discovery of information not previously disclosed, grant a continuance, dismiss the action, or "enter such other order as it deems just under the circumstances." CrR 4.7(h)(7)(i).

Park's CrR 4.7 motion included a request for a continuance so the State could pursue McGinty's Mississippi files, highlighting that the State had been aware of the potentially impeaching material from the time Park interviewed McGinty. During the pretrial interview, the State was present when McGinty shared that he did not have any Brady material filed against him following the false arrest lawsuit in Mississippi. He also stated that he discussed the lawsuit with the Bellingham PD when they hired him but was unaware if the Bellingham PD's "Brady team" had followed up on or reviewed the issue. When the trial court asked, "And were any efforts made to see what the Bellingham [PD] had in its files from when they hired Officer McGinty?", Park's counsel responded, "We were not provided that information, and . . . I can't make a record [about] what all was asked by [Park's investigator], but the report I got was [that] the hiring information was not provided. [The Bellingham PD] would not even give us the training material." The court inquired further, asking if there was any record of the requests in the form of a declaration, and Park confirmed there was none.

The State argued Park waived the discovery violation. The court denied the motion, reviewing the relevant timeline and reasoning as follows:

> Well, the interview with Detective McGinty happened on March 15th, 2023, in which he disclosed that there was potentially something in his employment file or in his history that could be impeachment evidence. The omnibus hearing was on April 24th, 2023. Trial confirmation was May 4th, 2023, and this trial started on May 8, 2023, and at none of those points until May 8th did the Defense raise any outstanding discovery issue, so as far as it being a discovery violation, I don't think that there's any basis for that at this point given the history of the case.

Therefore, the trial court did not explicitly base its ruling on waiver, as Park suggests on appeal. Regardless, even if the court took note of Park's delay in raising the discovery issue, we conclude it did not abuse its discretion in denying the motion on the merits.

12

CrR 4.7(a)(3) imposes a broad mandate upon the prosecutor to "disclose to defendant's counsel any material or information within the prosecuting attorney's knowledge which tends to negate defendant's guilt as to the offense charged." This rule "makes discoverable any impeachment information about witnesses whom the prosecution intends to call." Lange, 18 Wn. App. 2d at 151 n.36 (citing State v. Yates, 111 Wn.2d 793, 797, 765 P.2d 291 (1988); State v. Vavra, 33 Wn. App. 142, 145, 652 P.2d 959 (1982); accord CrR 4.7(a)(3)). Furthermore, CrR 4.7(a)(3) does not require a showing of materiality before the State must engage in discovery. Lange, 18 Wn. App. 2d at 150 ("a defendant must prove Brady materiality only when the information sought is not discoverable under subsections (a), (c), or (d) of the rule."). This mandated disclosure is limited to "material and information within the knowledge, possession, or control of members of the prosecuting attorney's staff." CrR 4.7(a)(4).

However, the State's obligations regarding "material held by others"—as was the case with McGinty's Mississippi and Bellingham PD files—are more limited:

> Upon defendant's request and designation of material or information in the knowledge, possession or control of other persons which would be discoverable if in the knowledge, possession or control of the prosecuting attorney, the prosecuting attorney shall attempt to cause such material or information to be made available to the defendant. If the prosecuting attorney's efforts are unsuccessful and if such material or persons are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to the defendant.

CrR 4.7(d). Additionally, the defendant must establish that the evidence outside of the State's control is material to their defense. Blackwell, 120 Wn.2d at 828.

In Blackwell, the defendants moved for a continuance—on the day trial was set to begin—based on a demand the State produce the service records of the arresting

officers. Id. at 824. The trial court granted the continuance and directed the State to investigate obtaining the records. Id. at 824-25. The State filed a motion for reconsideration under CrR 4.7(d), arguing it had no control over the service records. Id. at 825. In response, defense counsel argued that, based on a previous personal encounter, one of the arresting officers was racist, and they wanted to inspect both officers' service records because the arrests may have been racially motivated. Id. The State informed the court that it had attempted to obtain the files but was told by the Tacoma City Attorney's Office that they were not eligible to receive the records. Id. While the State suggested the trial court issue a subpoena to produce the documents, the trial court left the order unchanged, "but added a sentence permitting defense counsel to issue a subpoena duces tecum to the Tacoma Police Department." Id.

Our supreme court determined the trial court abused its discretion by ordering the State to produce the personnel files of the Tacoma police officers, as the files were not within the control or possession of the Pierce County Prosecutor's Office. Id. at 827. Furthermore, the defendants had failed to show the requested documents were material, as was necessary for documents outside of the prosecutor's control to be subpoenaed. Id. at 828. The defendants failed to establish any "factual predicate" to demonstrate the officers' records contained information material to their clients' defense, and no misconduct by either officer had been alleged. Id. at 829. The court reasoned it was insufficient to merely suggest that the arrest may have been racially motivated and insinuate the files "may lead" to material information. Id. at 828-29 (emphasis omitted).

In both this case and in <u>Blackwell</u>, the county prosecutor did not have control over the witness officer's police employment files, so CrR 4.7(d) applied. Park did not file a motion for the State to seek McGinty's Mississippi and Bellingham PD employment files until May 8, 2023, and the parties argued the motion on May 10. Even then, he did not request that the court issue subpoenas under CrR 4.7(d). Nor did he establish the requested records were material. McGinty's pre-trial interview did not indicate the subjects of the complaints against him, and the only other substantive issue McGinty discussed regarding his Mississippi employment was backing his vehicle into a stationary object, which is not impeachment evidence. McGinty also affirmatively asserted he was not on a <u>Brady</u> list before leaving Mississippi.[5] Here, as in <u>Blackwell</u>, a mere suspicion that the files "may lead" to material information would not "justify automatic disclosure of the documents." 120 Wn.2d at 829.

Likewise, Park's claim of a <u>Brady</u> violation fails because the record does not reflect that either the Mississippi or Bellingham PD files were exculpatory, impeaching, or material.[6] Because we find that the State did not violate its discovery violations under CrR 4.7 or <u>Brady</u>, Park's CrR 8.3(b) claim fails as well, as he cannot make a showing under the first prong of arbitrary action or government misconduct.

---

[5] Before Park cross-examined McGinty at trial, the trial court addressed the State's request to limit cross-examination regarding complaints and a lawsuit against him in Mississippi. Park admitted that he did not have evidence that McGinty made misrepresentations about the complaints or the lawsuit. The court ruled that because there was "no evidence that any complaints he received in Hattiesburg . . . had anything to do with his credibility as a witness," Park could not cross-examine McGinty "about the complaints in Hattiesburg, or his unwillingness to provide the records of those complaints."

[6] "In order to establish a <u>Brady</u> violation, a defendant must establish three things: (1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) the evidence must be material." <u>State v. Davila</u>, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)). Evidence is material when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). We review claims of <u>Brady</u> violations de novo. <u>State v. Mullen</u>, 171 Wn.2d 881, 894, 259 P.3d 158 (2011).

15

We conclude the trial court did not err in denying Park's motion to dismiss or continue in order for the State to obtain files that were not in its control and did not constitute Brady material that the State was required to disclose.

III.  Prosecutorial Misconduct

Park argues the prosecutor committed misconduct when he denigrated the defense, argued facts not in evidence, vouched for a witness, and made an improper emotional appeal to jurors. Park did not object to any of the comments at trial.

We generally review allegations of prosecutorial misconduct under an abuse of discretion standard. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). The defendant bears the burden of showing the comments were improper and prejudicial. Id. "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill[-]intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant and ill[-]intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.' " State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937

16

(2009) (quoting State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). A prosecutor may also argue that evidence does not support the defense theory. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Moreover, "[a] prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

A.  Impugning the Defense

Park challenges the prosecution's use of the phrase "smoke and mirrors" twice during his rebuttal closing argument, claiming it impugned the defense.

"[A] prosecutor must not impugn the role or integrity of defense counsel." Lindsay, 180 Wn.2d at 432 (citing State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008). This is so because "[p]rosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." Id. (citing Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983) (per curiam)).

Park relies on Lindsay, where the court found the prosecutor improperly impugned defense counsel when they referred to the entirety of the defense's closing argument as a "crock." 180 Wn.2d at 433. The court in Lindsay relied on a previous case, State v. Thorgerson, where the court similarly found the prosecution impugned the defense when it referred to the defendant's presentation of his case as "bogus" and "involving 'sleight of hand.' " Lindsay,180 Wn.2d at 433 (quoting Thorgerson, 172 Wn.2d at 451-52). In both instances, the courts reasoned the language qualified as improper commentary, as it implied " 'wrongful deception or even dishonesty in the context of a

court proceeding.' " Lindsay, 180 Wn.2d at 433 (quoting Thorgerson, 172 Wn.2d at 452).

Here, unlike the comments in Lindsay or Thorgerson, where the State described the entirety of the defense's argument as wrongful deception or dishonesty, the State made the challenged statements during rebuttal, in response to two specific comments in Park's closing argument. Park had argued in closing that McGinty's investigation of the case was insufficient to overcome the presumption of Park's innocence. Park first criticized the fact that McGinty had sunglasses on his head when he testified, arguing that it indicated McGinty was not "taking the case serious[ly]." He also questioned McGinty's failure to investigate E.'s behavior at school or follow-up with her school counselor, Penner.

In rebuttal, the State addressed Park's reference to McGinty's sunglasses, arguing that the comment was irrelevant and that McGinty wore what he regularly wears for work. The State continued, "[a]nything the Defense comes up and, you know, talks to you about Detective McGinty, that is smoke and mirrors." Further, the State argued that McGinty did "exactly what a detective should do" as E.'s allegations had already been reported to Penner and CPS. As to why McGinty did not further investigate E.'s behavior at school or follow up with Penner, the State argued that there was no need to do so because Penner testified at trial, and Park was able to cross-examine Penner directly. The prosecutor then said again, "[t]here's no reason for Detective McGinty to do that. It is smoke and mirrors, ladies and gentlemen." Given the context and the State's focus on rebutting specific aspects of Park's argument, the comments did not impugn the defense's entire argument and were not improper.

Regardless, even improper remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." Russell, 125 Wn.2d at 86. Here, as discussed, the prosecutor's argument was a clear response to defense's argument. The court instructed the jury to base its decision only on the testimony of the witnesses and exhibits in the case and that the attorney's arguments were not evidence. We presume that jurors follow the court's instructions. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). Accordingly, we conclude the prosecution's remarks were not so prejudicial they could not be cured by the jury instructions.

B. Other Alleged Prosecutorial Misconduct

Park argues the State "committed further misconduct by arguing facts outside the evidence, vouching for witnesses, and making an improper emotional appeal." We disagree, as Park did not object at trial to any of the challenged statements, and he does not establish that "an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 761.

In Park's closing argument, he challenged E.'s credibility. He discussed some of her inconsistent statements, and stated E.'s belief that she was assaulted cannot necessarily be the basis for the conviction, as memories are not always "connected with reality." He also disputed the overarching argument, that E. was groomed and did not understand that what was happening was wrong, and questioning why she waited until she was 13 to report any abuse. Park noted E.'s mother, Sullivan, and her stepmother,

Carlson, both testified that they did not suspect any abuse was occurring. Park stated,

"[t]hat's in and of itself fairly telling." In rebuttal, the State also addressed E.'s credibility:

> Why in the world would a 13 year old make up this story? Hmm? Why? There's no evidence that she had a bad relationship with her dad outside of this, right? Mr. Butler says, "Well, [Sullivan] didn't know. [Carlson] didn't know. How did they not know?"
>
> They didn't know because [E.] didn't know it was wrong. She wasn't running home to tell [Sullivan] or tell [Carlson]. She didn't know it was wrong, and so it continued. . . . So they had no reason to know; yet they did exactly what women in her life should do once this information came forward. They supported her.
>
> Who testified here on [E.]'s behalf? Hmm? Two women that had intimate relationships with [] Park. When they found out the allegations, they rallied behind and supported [E.] because they knew.

Park argues these comments misstate the evidence and rely on evidence outside the record because no witness testified on E.'s behalf or as to what they "knew."[7] Further, citing Lindsay, 180 Wn.2d 423, he argues these final comments were especially harmful because they were some of the last words the jury heard before it began deliberations. He contends it is immaterial whether a witness is called by the prosecution or the defense, as "each party is entitled to the benefit of all of the

---

[7] Park also argues that although he did not specifically object during closing argument to the prosecution's improper arguments, he nevertheless preserved his claims because the court granted his motions in limine to prohibit the prosecution "from making a deliberate appeal to the jury's passion or prejudice" and "from arguing to the jury any evidence not contained in the record." However, "even when a trial court has already excluded evidence through a pretrial order, the complaining party should object to the admission of the . . . evidence . . . unless an unusual circumstance exists 'that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible.' " State v. Weber, 159 Wn.2d 252, 272, 149 P.3d 646 (2006) (quoting State v. Sullivan, 69 Wn. App. 167, 173, 847 P.2d 953 (1993). Examples of "unusual circumstances" are when another party's questions are " 'in deliberate disregard of the trial court's ruling,' or 'an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the court.' " Weber, 159 Wn.2d at 272 (quoting Sullivan, 69 Wn. App. at 173). Here, there is no indication that the State's final comments were in deliberate disregard of the court's initial ruling, which did not relate to specific evidence but rather merely stated standard categories of argument that constitute prosecutorial misconduct. Park's motions in limine were not sufficient to preserve any claimed error regarding specific subsequent statements during closing argument, so we apply the heightened standard for establishing prosecutorial misconduct.

evidence, whether or not that party introduced it." However, here, by stating Sullivan and Carlson testified "on E.'s behalf," the prosecutor was referencing the fact that they testified favorably for E. Doing so was not improper.

Second, Park contends that because there was no testimony as to what Sullivan or Carlson "knew," this statement "vouched for [E.]'s credibility, the key issue in the case." It is misconduct for a prosecutor to express a "personal belief as to the veracity of a witness." State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion) (citing United States v. Brooks, 508 F.3d 1205, 1209 (9th Cir. 2007)). " 'Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.' " State v. Robinson, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015) (quoting State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010)). We will not find prejudicial error "unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Park fails to provide applicable legal authority or analysis to support his argument regarding vouching.[8] See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (court will not consider argument unsupported by citation to authority). The prosecutor's comments neither placed the prestige of the government behind E. or indicated that information not presented to the

---

[8] The cases Park cites did not involve vouching by the State, but by witnesses. E.g., State v. Aguirre, 168 Wn.2d 350, 359-61, 229 P.3d 669 (2010) (an expert witness vouches for victim credibility); State v. Demery, 144 Wn.2d 753, 758-59, 30 P.3d 1278 (2001) (police officer testifies as to whether a defendant was truthful during an interview); State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987) (expert provided direct opinion on the credibility of the victim and the alleged guilt of the defendant).

jury supported the witness's testimony. Nothing in the statements suggested the prosecutor had a special source of knowledge. Furthermore, Park fails to show how this is a "clear and unmistakable" example of the prosecution communicating their personal opinion on the issue. He also does not explain why an instruction could not have cured any resulting prejudice.

Finally, Park argues that these final comments that "[E.]'s mother and step-mother, as the women in [E.]'s life, did what they were supposed to do: believe and support her," was an improper emotional appeal to the jury because "[i]mpliedly, the prosecutor was telling the jury that they should convict because [E.], an alleged victim, deserves to be believed and supported." This argument also is unavailing.

Prosecutors "commit misconduct when they use arguments designed to incite the passions or prejudices of the jury." State v. Zwald, 32 Wn. App. 2d 62, 75-76, 555 P.3d 467 (2024) (citing In re Personal Restraint of Glassmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion)). "These kinds of arguments create a danger that the jury may convict for reasons other than the evidence produced at trial." Zwald, 32 Wn. App. 2d at 76 (citing State v. Ramos, 164 Wn. App. 327, 338-39, 263 P.3d 1268 (2011)).[9]

Park cites State v. Craven in support of his argument. 15 Wn. App. 2d 380, 475 P.3d 1038 (2020). In Craven, the prosecutor "equated having a verdict 'feel right' or 'make sense' emotionally and morally with applying the law to the facts of the case." Id.

---

[9] Park also cites to cases in which prosecutors referenced evidence outside of the record to enflame the jury, but those cases are inapposite factually. In State v. Belgarde, the prosecutor invited jurors to convict the defendant of murder based on the defendant's association with the American Indian Movement, which he described as a "deadly group of madmen" and "butchers that kill indiscriminately." 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). In State v. Claflin, the prosecutor read a poem by an anonymous rape victim to show how the alleged victims of the defendant "probably felt." 38 Wn. App. 847, 849-50, 690 P.2d 1186 (1984).

at 385. Because the core and repeated theme of the argument expressly invited the jury to reach its verdict based on their emotions and visceral instincts, the argument was improper. Id. at 390.

This case is distinguishable from Craven. Here, the State did not make an equivalent argument. Indeed, before the above-recited comments, the prosecutor emphasized that the jury is the final judge of the credibility of witnesses and reread portions of the relevant jury instructions. And in context, the State's comments operated as a response to Park's argument concerning E.'s credibility. Finally, Park does not explain why an instruction would not have cured any resulting prejudice. We reject Park's claim of prosecutorial misconduct on this ground as well.

IV.  Community Custody Conditions

Park argues that in the alternative, remand is required to fix several errors related to his sentence, including two community custody conditions.[10] We review community custody conditions for abuse of discretion. State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018).

First, Park argues that "[t]he condition requiring [him] to complete a mental health evaluation and comply with any recommended treatment is not supported by the evidence and must be stricken." To impose this condition, the court had to first find that "reasonable grounds exist to believe that the offender is a mentally ill person as defined in RCW 71.24.025, and that this condition is likely to have influenced the offense." RCW 9.94B.080. Here, there were no such findings or evidence to support such findings. The

---

[10] Park also argues that remand is necessary because the trial court failed to enter written findings of fact and conclusion of law in support of his exceptional sentence. However, the court belatedly entered findings of fact and conclusions of law in June 2024. Thus, we need not address this claim.

State agrees that "the trial court did not make the requisite findings to impose this condition, nor does this case reflect a mental illness contributed to Park's offense." Thus, we remand to the trial court to strike the mental health evaluation condition.

Second, Park challenges condition 10, which requires him to "consent to DOC home visits to monitor [his] compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which [Park] live[s] or [has] exclusive/joint control/access." Park argues that condition 10[11] is unconstitutionally overbroad and, thus, violates article I, section 7 of the Washington Constitution. The State contends this issue is not ripe for review. We agree with the State.

A claim is ripe for review on direct appeal " 'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " State v. Sanchez Valencia, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010) (quoting State v. Bahl, 164 Wn.2d 739, 751, 193 P.3d 678 (2008)). " 'The court must also consider the hardship to the parties of withholding court consideration.' " Id.

In State v. Cates, a nearly identical community custody condition was challenged, and the court determined a pre-enforcement challenge was not ripe for review. 183 Wn.2d 531, 354 P.3d 832 (2015). The court reasoned that although the condition was a final action and the challenge was primarily legal, the defendant would not experience immediate hardship and misapplication depended on the " 'particular circumstances of the attempted enforcement,' " and thus, the claim necessitated further factual development. Id. at 535 (quoting Sanchez Valencia, 169 Wn.2d at 789). Our supreme court recently reaffirmed this reasoning. State v. Nelson, 4 Wn.3d 482, 498,

---

[11] In briefing, Park challenges condition eight, but the language he quotes is in condition 10.

565 P.3d 906 (2025) (holding <u>Cates</u> "serve[s] as guidance to lower courts in assessing ripeness of preenforcement challenges to community custody conditions").

Accordingly, based on <u>Cates</u> and <u>Nelson</u>, we reject Park's challenge, as the issue similarly requires factual development before it can be reviewed and Park will not experience immediate hardship because of this denial.

V. <u>Legal Financial Obligations</u>

Park argues this court should strike the VPA and the order for him to pay his supervision fees as a part of his conditions for community custody because he is indigent[12] and recent amendments to the statute bar courts from imposing such fees on indigent defendants. The State agrees that the VPA should be stricken and argues this court should "remand to the trial court to consider Park's ability to pay supervision costs." The 2023 statutory amendments that prohibit courts from imposing the VPA when the defendant is indigent, RCW 7.68.035(4), apply to matters pending on direct appeal. <u>State v. Ellis</u>, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023), <u>review granted</u>, 4 Wn. 3d 1009, 564 P.3d 547 (2025).

Additionally, RCW 9.94A.703(2) "no longer authorizes the imposition of community custody supervision fees," regardless of ability to pay. <u>Ellis</u>, 27 Wn. App. 2d at 17 (citing LAWS OF 2022, ch. 29, § 7). This change in law was in effect at the time of Park's sentencing. Thus, we remand to strike the VPA and the order requiring payment of supervision fees from Park's judgment and sentence.

---

[12]The sentencing court suspended the DNA collection fee due to Park's indigency.

VI. SAG

Park argues two additional issues in his SAG. RAP 10.10(a). First, he argues the "[d]estruction and subsequent failure to produce [McGinty's] rough notes from the 'tipped phone call' was a violation of due process under the Jencks Act (18 [U.S.C.] § 3500)." Second, he argues that "[u]se of evidence without regard to jurisdiction between Yakima and Whatcom in the name of an 'aggravator' introduce prejudice preventing a fair trial."

As to his first claim, Park does not indicate where in the record there was an objection or motion concerning the shredded or withheld notes. Under RAP 2.5(a), this court may decline to review any claim of error which was not raised in the trial court. An exception to this rule is when the alleged violation is a "manifest error affecting a constitutional right." RAP 2.5(a). Although Park describes the shredded or withheld notes as a due process violation, the Jencks Act controls federal criminal procedure and thus, is not relevant here. State v. Robinson, 61 Wn.2d 107, 111-12, 377 P.2d 248 (1962) ("We are not governed by the decision in the Jencks case for it was not decided upon constitutional grounds; at most, it established a rule of procedure for criminal cases in federal courts.") (citing Jencks v. United States, 353 U.S. 657, 672 (1957)). Accordingly, we decline to consider the issue as the error is not preserved and the alleged violation does not concern a manifest error affecting a constitutional right.

Park additionally challenges the introduction of evidence concerning sexual abuse that the State used to prove the "pattern of abuse" aggravating factor. Park claims introducing evidence of incidents that occurred outside of Whatcom County "before the guilt phase of the trial is over" was prejudicial. To prove the aggravating

factor, the State elicited testimony from E. that described acts outside of Whatcom County. RCW 9.94A.535 controls departures from the sentencing guidelines, and subsection (3) identifies aggravating circumstances that a jury may determine and the court may consider to support a sentence above the standard range. RCW 9.94A.535(3)(g) specifies that an exceptional sentence could be appropriate if "the offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time."

Park cites to Fed. R. Evid. 105 in support,[13] which controls evidence of limited admissibility. The analogous state rule, ER 105, states, "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." This court reviews a trial court's evidentiary decisions for an abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).

We conclude the trial court did not abuse its discretion, as it properly provided a limiting instruction pursuant to ER 105. Here, Park objected to evidence of incidents that occurred outside of Whatcom County on the record and through his motion in limine. The court denied the motion, reasoning that the evidence would be "relevant towards the aggravating factors that the State has alleged that there's behavior that happened potentially in another county." The trial court provided an oral limiting instruction contemporaneously with E.'s testimony concerning the acts outside of Whatcom

---

[13] Though Park cites to the federal rules, the state evidence rules (ER) apply here.

County. Additionally, jury instruction 14 repeated this limiting instruction.[14] "We presume that a jury will follow the instructions provided to it." State v. Mohamed, 186 Wn.2d 235, 244, 375 P.3d 1068 (2016). Therefore, the trial court did not abuse its discretion when it admitted evidence of prior acts outside of Whatcom County and provided adequate instruction limiting its purpose.

CONCLUSION

We affirm the conviction and remand to the trial court to strike community custody condition nine requiring Park to undergo a mental health evaluation and to comply with treatment, the VPA, and community custody supervision fees.

_Chung, J._

WE CONCUR:

_Díaz, J._

_, ACJ_

---

[14]"Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony regarding alleged conduct outside of Whatcom County and may be considered by you only for the purpose of the special verdict forms regarding an ongoing pattern of sexual abuse. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation."